IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        )
                                )
          v.                    )    Criminal No. 11-29
                                )               11-172
EMERSON BEGOLLY                 )

## DEFENDANT EMERSON BEGOLLY'S MOTION TO EXCLUDE STATEMENTS BASED UPON VIOLATION OF THE SIXTH AMENDMENT RIGHT TO COUNSEL

Defendant Emerson Begolly ("Mr. Begolly"), through his counsel, Assistant Federal Public Defender Markéta Sims, respectfully moves the Court to exclude evidence at sentencing of statements taken from him by the Government in violation of his Sixth Amendment right to counsel. Specifically, Mr. Begolly moves to exclude statements the Government deliberately elicited from him, post-indictment, using a wired Government informant at the Northeast Ohio Correctional Center. In support thereof counsel states:

I. INTRODUCTION AND FACTUAL BACKGROUND

A.   The Pennsylvania Indictment

Undersigned counsel was appointed by this Court on January 6, 2011, to represent Mr. Begolly in Criminal No. 11-29, charging him with on two counts of infliction of bodily harm on an officer or employee of the United States in violation of 18

U.S.C. § 111(a)(1) and (b)(Counts I and II)  and one count of using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i)(Count III)("the Pennsylvania Indictment").

The Pennsylvania Indictment concerned an incident that occurred on January 4, 2011.  On that date, Mr. Begolly was twenty-one years old.  The FBI wanted to question Mr. Begolly regarding internet postings that later became the subject of the Virginia Indictment.  At the time, Mr. Begolly was estranged from his mother, Joan Kowalski, and was living with his father, Shawn Begolly, on Mr. Begolly's farm in Clarion, County.

The FBI agents convinced Ms. Kowalski to lie to her son and tell him that his grandmother was gravely ill and near death, in order to lure him away from his father's farm so they could question him.  Ms. Kowalksi agreed to this plan and told  Mr. Begolly that his grandmother was gravely ill and that she needed to pick him up from the farm right away.

Ms. Kowalski then stopped at a fast food restaurant and falsely told Mr. Begolly that she was just going inside for a beverage.  Once Ms. Kowalski was away from the car, two plain clothes FBI agents approached the car in a stealthy manner and threw open the doors.

Mr. Begolly, who suffers from autism and Asperger's Disorder, was startled and frightened by this action and a confrontation ensued, during which Mr. Begolly bit the FBI agents, leading to the filing of the Pennsylvania Indictment.

Mr. Begolly was deeply hurt by his mother's lying and betrayal and the FBI's use of his mother in this manner damaged their relationship. However, Mr. Begolly has long since forgiven his mother, coming to realize that she acted out of a desire to help him and was frightened and manipulated by the Government. Ms. Kowalski visits Mr. Begolly at the Northeast Ohio Correctional Center and has been actively involved in his defense.

The FBI's use of Mr. Begolly's mother in this manner was sensationalized and received significant attention in the news media. Consequently, Mr. Begolly's mother's role in the case became common knowledge among inmates housed with Mr. Begolly at NEOCC.

B. <u>The Virginia Indictment and Mr. Begolly's Guilty Plea</u>

Subsequently, undersigned counsel was appointed on August 3, 2011 to represent Mr. Begolly on Criminal No. 11-172, a case originating in the Eastern District of Virginia, charging Mr.

3

Begolly with one count of solicitation to commit a crime of violence in violation of 18 U.S.C. 373(a) (Count I) and one count of distribution of information relating to explosives, destructive devices, and weapons of mass destruction in violation of 18 U.S.C. § 842 (Count II)(the "Virginia Indictment). That indictment concerns postings by Mr. Begolly on the internet.

On August 9, 2011, pursuant to a plea agreement, Mr. Begolly entered a guilty plea to Count III of the Pennsylvania Indictment and Count I of the Virginia Indictment.

C.    <u>The Informant</u>

On July 19, 2012, Ziad H. Rawahneh and Christopher McNutt were indicted in the Northern District of Ohio for two counts arson affecting interstate commerce. In particular, Mr. Rawahneh and Mr. McNutt were charged with maliciously damaging and destroying, and attempting to damage or destroy by means of fire, the Goodtimes Pub and Drive Thru, which Mr. Rawahneh owned. <u>See</u> <u>United States of America v. Ziad Rawahneh</u>, Crim. MJ 12-1090, Criminal Complaint, attached as Exhibit 1.

According to the Criminal Complaint, in that case, fires were deliberately set on two separate occasions, on February 8

and 9, 2012, using pump sprayers containing gasoline, at the Goodtimes Pub.  The Criminal Complaint further alleges that in May of 2012, Mr. Rawahneh twice communicated with Westfield Insurance Investigator Bruce Shuck.  In those conversations, Mr. Rawahneh stated that he knew  the fires were arson, but denied involvement.   Ex. 1, at 4.   However, the Complaint alleges, surveillance footage from a Home Depot store in Canton, revealed that Mr. Rawahneh and his co-conspirator, Christopher McNutt, purchased the pump sprayers used to set the fires.  Id., at 5.

At the detention hearing and preliminary hearing, it was clarified that Mr. Rawahneh made his false statements denying involvement in the arson under oath during a deposition conducted by his insurance company.  Detention and Preliminary Hearing Transcript, pp. 10-11, 15, 42,  attached as Exhibit 2.

Furthermore, the investigating FBI Agent, Michael Siroham, testified that when he questioned Mr. Rawahneh regarding the pump sprayers, Mr. Rawahneh "said he had no knowledge of the pump sprayer or where it came from." Detention and Preliminary Hearing Transcript, at 41.

The Criminal Complaint further alleges that Christopher McNutt, an employee of the Goodtimes Pub,  was interviewed on June of 2012, and confessed that Mr. Rawahneh recruited him to purchase the pump sprayers and to set the two fires at the

5

Goodtimes Pub so that Mr. Rawahneh could collect the insurance money. Id., at 5-6. Mr. McNutt stated that Mr. Rawahneh promised to pay him $10,000 to set fire to the Goodtimes Pub. Id., at 6.

On June 29, 2013, Mr. Rawahneh was ordered detained and housed at NEOCC because "there [was] no condition or combination of conditions that [would] reasonably assure the appearance of the defendant at future proceedings." Detention Order Pending Trial, attached as Exhibit 3. The Magistrate Judge based her order on evidence that Mr. Rawahneh intended to flee to Jordan after collecting the insurance money.

There was also evidence introduced at the detention hearing that Mr. Rawahneh had been involved in arranging a sham marriage for his co-defendant, Christopher McNutt, to a Moroccan national. Detention and Preliminary Hearing, at 61-62. There was further testimony that Mr. Rawahneh paid the workers at the Goodtimes Pub in cash. Id., at 62. Furthermore, at the detention hearing Mr Rawahneh falsely maintained, through counsel, that Mr. McNutt acted alone in committing the arson. Detention and Preliminary Hearing Transcript, at 71.

Mr. Rawahneh filed an appeal of the detention order, in which he continued to falsely deny involvement in the arson and claimed that Mr. McNutt acted alone. Defendant Rawahneh's

<u>Appeal of Detention Order</u>, attached as Exhibit 4.  Ironically, Mr Rawahneh claimed that Mr. McNutt was falsely accusing him of the crime.  Mr. Rawahneh's appeal of his detention order was denied on November 19, 2012.

On January 28, 2013, Mr. Rawahneh finally admitted that, indeed, he had committed the arsons, pleading guilty to both Counts in the Indictment.  Thus, Mr. Rawahneh's claim that Mr. McNutt acted alone turned out to be just another lie.  Indeed, Mr. Rawahneh received an obstruction of justice enhancement to his sentence.

Thus, Mr. Rawahneh, the confidential informant the Government asks the Court to credit here, fraudulently lied to an insurance company, under oath, about his involvement in a federal arson, could not be relied upon to honor his promises to the Court to appear for proceedings, repeatedly and falsely claimed that his codefendant acted alone, was involved in arranging a sham marriage, paid his employees in cash, and obstructed justice.  These facts strongly suggest that his uncorrobated claims about Mr. Begolly should be viewed with deep suspicion.[1]

---

[1] Despite asking the Court to credit the informant's statements, the Government has yet to provide any <u>Giglio</u> impeachment material concerning its informant.  All of the above information was obtained by defense counsel from the

Almost immediately upon Mr. Rawahneh's arrival at NEOCC both Mr. Begolly, and a second Muslim client of the Federal Public Defender's office, Khalifa Al-Akili, reported to defense counsel that Mr. Rawahneh, who was a Muslim of Jordanian ancestry, appeared to be an informant and agent provocateur. Mr. Begolly also informed his father of his information at about the same time and Mr. Begolly's father informed defense counsel that it appeared that the FBI had placed an informant at NEOCC to interrogate Mr. Begolly.

Mr. Begolly reported that Mr. Rawahneh stated that he hated African Americans, using a highly offensive term for African Americans, and that Mr. Rawahneh further stated that he "wanted to do bad to America," and that he was "pro-Hammas." Furthermore, it was known among inmates at NEOCC that Mr. Rawahneh had been charged with conspiring to burn down his business for the insurance money and had been involved in arranging a sham marriage for his codefendant. Eventually, Mr. Rawahneh cooled off on making extremist remarks after he failed to get a reaction and other inmates started avoiding him. Mr. Rawahneh then attempted to befriend Mr. Begolly by buying him soup and ice cream from the commissary. Mr. Rawahneh further

---

public record.

encouraged Mr. Begolly to make the Hajj pilgrimage to Mecca and offered to sponsor him if Mr. Begolly wanted to study in Jordan.

After these overtures, Mr. Rawahneh steered the conversation to Mr. Begolly's case and specifically Mr. Begolly's mother's involvement.   In particular, Mr. Rawehneh told Mr. Begolly that because of his case he would never be accepted in society and he should become a suicide bomber.  Mr. Begolly declined that suggestion, pointing out that suicide and harming others is wrong and not Islamic.

Mr. Rawahneh persisted, insisting that Mr. Begolly write down details of his case, which Mr. Begolly declined.   Mr. Rawahneh also adamantly insisted that Mr. Begolly's mother had wronged him.

Significantly, at various points throughout this time period, which lasted from July of 2012 through November of 2012, including at the time the Government made the recordings, NEOCC officials at various points deliberately placed Mr. Rawahneh in Mr. Begolly's cell.  The Government has yet to confirm or deny whether this was done at the request of the Government.

However, according to the Government's Response to Defendant's Motion to Continue the Sentencing and Due Date for Sentencing Memoranda, Dkt. No. 55, on October 12, 2012, Mr. Rawahneh, whom the Government identifies as simply "the

confidential informant," met with agents of the FBI under a proffer agreement from the United States Attorney's Office for the Northern District of Ohio. Response, at 7. The Government alleges that during that meeting, Mr. Rawahneh (whom the Government refers to only as the "confidential informant") claimed that Mr. Begolly had claimed that when he was released from prison he intended to kill his mother because she cooperated with the Government in his apprehension and that he was going to hire "Tom Nuttell" to do so.

Notably, this meeting took place during the time period in which Mr. Rawahneh's bond appeal, in which he falsely claimed that his codefendant, Mr. McNutt acted alone, was pending. Thus, Mr. Rawahneh had already demonstrated that he was desperate enough to get out of prison to falsely accuse another person.

The Government further asserts that on November 1, 2012, Pittsburgh based FBI agents met with "the confidential informant," and he repeated his accusation against Mr. Begolly. Mr. Rawahneh's bond appeal, with its false claims, remained pending at that time.

Thus far the Government has to failed to provide the defense with **any** of "the confidential informant's" statements regarding Mr. Begolly's alleged statements, despite the fact

that the Government has now included those alleged statements in a filing with the Court and asked the Court to credit them.

Mr. Rawahneh's bond appeal was denied on November 19, 2012. United States v. Rawahneh, Crim. No. 12-345, Dkt. No. 30.

Thereafter, on November 30, 2012, Mr. Rawahneh recorded a conversation between himself and Emerson Begolly in their shared prison cell.

Despite the fact that the Government is well aware that Mr. Begolly objects to the use of this recording at sentencing the Government makes reference in its Response to statements allegedly made in the recording and even goes so far as to **attach** a copy of the transcript to its Response. Such conduct is a rather transparent attempt to circumvent Mr. Begolly's due process right to have the matter adjudicated **prior to** the Court being exposed to the disputed evidence. Indeed, given the clear Supreme Court precedent precluding such evidence, it appears that the primary purpose of the Government's Response was to spread inadmissible information upon the record.

The contents of the recording are irrelevant to the question of its admissibility under the Sixth Amendment, given the Government's assertion that the recording is relevant to sentencing. Indeed, the Government claims that the recording is evidence of "lack of remorse and reformation." Response, at

11

14. Rather, as set out below, the critical question is whether the Government seeks to introduce the recording against the defendant in the case for which the Sixth Amendment right to counsel had attached.  In this case, the Government does, in fact, seek to introduce the recording in the very cases for which the Sixth Amendment right to counsel had attached, and therefore the recording may not be admitted.  The Government's claims that it interrogated Mr. Begolly in pursuit of an investigation of separate charges, which were never filed, is irrelevant, because the Government does not seek to introduce the recording as to those  never filed charges, but seeks to introduce it at the sentencing on charges for which the Sixth Amendment right to counsel had attached.  *See* *infra*.

Thus, there is no need for the Court to review the transcript in order to rule on Mr. Begolly's motion to exclude his purported statements based on violation of the Sixth Amendment.  In a case such as this, where there is no need for the Court to review the defendant's statements prior to ruling on their admissibility on constitutional grounds, the Court should not review them so as to prevent the Court, as fact finder, from being influenced by inadmissible evidence.  See Jackson v. Denno, 378 U.S. 368 (1964)(Finding that state procedure providing for the jury to simultaneously determine the

defendant's guilt and the voluntariness of his confession violated due process; defendant was entitled to have the Court to determine voluntariness prior to the jury determining guilt); <u>United States ex. rel. Spears v. Rundle</u>, 268 F.Supp. 691 (E.D. Pa. 1967)(Holding that fundamental fairness required that where the court was the fact-finder, another judge was required to hear evidence concerning the voluntariness of a confession), aff'd sub nom, <u>United States ex rel Spears v. Rundle</u>, 405 F.2d 1037 (3d Cir. 1969). <u>United States ex. rel. Owens v. Cavell</u>, 254 F. Supp. 154 (M.D. Pa. 1966)(questioning "whether a judge sitting as fact-finder would be able to pass on guilt or innocence without being influenced by evidence relating to the voluntariness [of a confession"). <u>See also</u> Andre J. Wistrich et. Al., <u>Can Judges Ignore Inadmissible Information?  The Difficulty of Deliberately Disregarding</u>, 153 Pa. L. Rev. 1251(2005)(reporting on the results of experiments designed to test the ability of trial judges to disregard inadmissible information and finding mixed results).

Moreover, the Government *still* has not provided a copy of the recording to the defense, despite requests dating back to March of 2013.  The recording is likely to be revealing as in the transcript, the Government claims that there are *62* separate instances when the informant's statements were allegedly

"inaudible."   Notably, Mr. Rawahneh is not a native English speaker and required an interpreter during his legal proceedings.

Furthermore, in the transcript, the Government claims many of Mr. Begolly's alleged statements are "inaudible."   Thus, the Government has produced an incomplete purported "transcription" of a recording it refuses to produce and asks this Court to simply takes it word for what is on that recording.

Accordingly, Mr. Begolly will not respond to the Government's characterization of the transcript until the Court rules on the issue of whether its use at Mr. Begolly's sentencing violates the Sixth Amendment and the Government finally provides a copy of the recording.   However, Mr. Begolly does not agree with the Government's assertion that the, as-yet-to-be-disclosed recording is evidence of "lack of remorse and reformation."   Indeed, at sentencing, significant evidence will be presented that Mr. Begolly has substantial remorse for his conduct and has made significant strides at rehabilitation and reformation.[2]

---

[2] Mr. Begolly also disputes the Government's characterizations and paraphrasing of its own transcript. See e.g., Response, at 9.

In any event, the conversation, as noted, did not result in any charges being brought against Mr. Begolly.  Indeed, several months later, in March of 2013, the Government separately informed both Ms. Kowalksi and defense counsel that it had determined that Mr. Begolly, in fact, **did not** plan to kill his mother or to hire "Tom Nuttell" to do so.  An FBI interview with  Tom Nuttell, a local drunk and addict, in the town where Ms. Kowalski grew up, revealed that Mr. Nuttell barely knew Mr. Begolly and had not been in contact with him in many years.  He was unaware of any plot to kill Mr. Begolly's mother.  Despite the obvious impeachment value of this interview, the Government has yet to provide a copy of it to the defense.

As the Government concedes, it did not inform defense counsel that it had questioned Mr. Begolly using a wired informant until March 18, 2013.  Defense counsel immediately requested a copy of the recording, but, months later, the Government has not provided a copy of it.

The Government further concedes, that in the interim, NEOCC provided the informant with privileged access to the attorney/client visiting area as a porter.  Response, at 6.  Although the Government "avers that absolutely no privileged information was requested, received or cultivated by the

15

government from the informant," it does not provide any further information as to how an individual known by NEOCC to be an FBI informant, who had been permitted to record another inmate, was then placed in a position where he had ready access to eavesdrop on attorney/client conversations, as well as private conversations between inmates and their family members. Moreover, Mr. Rawahneh was observed actively eavesdropping on private conversations between inmates and family members while he was assigned as a porter in the visiting area.

The fact that the Government apparently sees nothing wrong with NEOCC allowing an FBI informant, especially one with a history of dishonesty and deceit, privileged access to the attorney/client visiting area, is reflective of the Government's disregard for Sixth Amendment protections as set out below.

III. THE USE OF THE STATEMENTS OBTAINED BY MR. RAWAHNEH AGAINST MR. BEGOLLY AT SENTENCING VIOLATES THE SIXTH AMENDMENT

Although the statements obtained by the Government did not result in new charges against Mr. Begolly, the Government now seeks to introduce those statements against Mr. Begolly against him at sentencing in the instant case.  This it may not

16

constitutionally do. <u>Response</u>, at 12-14. ("Since the government has determined that no charges for Retaliation against a Federal Witness will be pursued, the government's submission of this recorded evidence pertains soley to the Defendant's upcoming sentencing hearing . . ."). The Supreme Court has held, unequivocally, that statements obtained by the Government in violation of the defendant's Sixth Amendment right to counsel may not be used against him at sentencing on the charge upon which the right to counsel had attached. <u>Estelle v. Smith</u>, 451 U.S. 454 (1981)(Vacating sentence because the government introduced at sentencing statements the defendant made during a psychiatric examination conducted in violation of his Sixth Amendment right to counsel).

In <u>Smith</u>, the trial court ordered a psychiatric examination of the defendant without notifying defense counsel. The prosecution then introduced statements made by the defendant to the psychiatrist, over defense objection, at sentencing. The Supreme Court held that the introduction of the psychiatrist's testimony at sentencing violated the defendant's Fifth and Sixth Amendment rights. <u>Smith</u>, 451 U.S. at 462

First, the Supreme Court held that the Fifth Amendment was fully applicable at sentencing, ruling that, "[t]he Fifth Amendment, made applicable to the states through the Fourteenth

17

Amendment, commands that '[n]o person . . . shall be compelled in any criminal prosecution to be a witness against himself.' The essence of this basic constitutional principle is 'the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not be the simple, cruel expedient of forcing it from his own lips.'" <u>Smith</u>, 451 U.S. at 462. (Emphasis in original). <u>See also</u> <u>Mitchell v. United States</u>, 526 U.S. 314 (1999)(holding that a guilty plea does not waive the Fifth Amendment privilege at sentencing and the Court may not draw an adverse inference with respect to a factual determination based upon the defendant's invocation of her Fifth Amendment rights at sentencing, *citing*, <u>Smith</u>.).

The Supreme Court concluded that the psychiatrist's failure to administer Miranda warning rendered his testimony based upon the defendant's unwarned statements inadmissible at sentencing under the Fifth Amendment. <u>Id</u>., at 463. Specifically, the Supreme Court held that, "[t]he Fifth Amendment privilege, therefore is directly involved here because the State used as evidence against respondent the substance of his disclosures during the pretrial psychiatric examination." <u>Id</u>., at 465. <u>See also</u> <u>Brown v. Rundle</u>, 417 F.2d 282, 284-85 (3d Cir. 1969)(Reversing 5-20 year sentence because the trial judge

relied upon a confession at sentencing that it had previously ruled was inadmissible at trial); <u>United States v. Rivers</u>, 384 F.2d 737, 742-43 (3d Cir. 1967)(Reversing sentence, based upon a finding that defendant's second confession, upon which the trial court based its sentence, was not voluntary).

The Supreme Court further held that introduction of the psychiatrist's testimony at sentencing violated the defendant's Sixth Amendment right to assistance of counsel, noting that, "[w]hen respondent was examined by Dr. Grigson, he already had been indicted and an attorney had been appointed to represent him."  Accordingly, at the time of the post-indictment psychiatric interview, the defendant "had a Sixth Amendment right to the assistance of counsel before submitting to the pretrial psychiatric interview." <u>Smith</u>, 451 U.S. at 469.  Thus, the Supreme Court held that the use of the psychiatrist's testimony at sentencing, when the defendant had not been afforded the assistance of his appointed counsel, "in making the the significant decision of whether to submit to the examination at to what end the psychiatrist's findings would be employed," rendered that testimony inadmissible because such introduction violated the Sixth Amendment.  <u>Id</u>., at 470-71.  <u>United States v. Chitty</u>, 760 F.2d 425 (2d Cir. 1985)(Use at sentencing of statements made by the defendant threatening to kill the

prosecutor during unwarned and uncounseled competency evaluation by a psychiatrist violated the Fifth and Sixth Amendments, requiring reversal of sentence).

Chitty bears factual similarities to the instant case, because the prosecution sought to use unwarned and uncounseled alleged threatening statements by the defendant against him at sentencing.  In Chitty, the defendant was subjected to a post-indictment competency evaluation, during which he was not provided with Miranda warnings, nor provided the assistance of counsel.  During that evaluation, the defendant made threatening statements about one of the Assistant United States Attorneys prosecuting him.  The Government then emphasized those statements at sentencing in seeking a longer sentence, arguing that because he made the statements, the defendant should be incarcerated for "a very long time."  Chitty, 760 F.2d at 430.

The Second Circuit reversed the sentence, finding that the failure to provide Miranda warnings rendered the statements inadmissible under the Fifth Amendment.  Chitty, 760 F.2d at 431.  The Second Circuit in Chitty further noted that the Sixth Amendment was also implicated by the post-indictment, unwarned interview of the defendant, but did not reach the issue because it decided the case on Fifth Amendment grounds.  Chitty, 760 F.2d at 431, n. 3.

Accordingly, the Government's position that a statements obtained in violation of the defendant's Fifth and Sixth Amendment rights are admissible at sentencing, finds no support in the law.  See Response, at 12.  To the contrary, the Court may **not** rely on a defendant's statements obtained in violation of either the Fifth or Sixth Amendments.  Moreover, neither 18 U.S.C. § 3661, or United States Sentencing Guidelines, § 1B1.4, authorize the Court to consider evidence inadmissible under the Fifth and Sixth Amendments at sentencing.

Moreover, the cases that the Government in support of its argument that it may use statements obtained in violation of Mr. Begolly's Sixth Amendment right to counsel do not stand for that proposition.  In particular, the Government cites United States v. Bender, 221 F.3d 265 (1st Cir. 2000) for the proposition that the Government may introduce, at sentencing, post-indictment statements the defendant made to an undercover government agent concerning a plot to falsify an alibi and kidnap and murder government witnesses.  But, in Bender, the First Circuit **affirmed** the district court's suppression of the defendant's post-indictment statements to the undercover agent because use of such statements would violate the Sixth Amendment.  Bender, 221 F.3d at 267.  In so holding, the Bender Court also noted that the statements would be admissible if the Government chose

to prosecute the defendant on new charges of subornation of perjury or obstruction of justice, and that the statements would be admissible at sentencing *on those new charges*, citing United States Sentencing Guidelines, Section 2C1.1, the obstruction of justice guideline.   Bender, 221 F.3d at 271.   Bender most assuredly did *not* hold that uncounseled post-indictment statements may be admitted at sentencing in the *same* case. Indeed, Bender stands for the opposite proposition.

Similarly, the Government's citation to United States v. Graham-Wright, 2013 WL 1876228 (6th Cir. 2013) for the proposition that statements taken in violation of a defendant's Fifth Amendment rights are admissible at sentencing is inaccurate.   The Court in Graham found no Fifth Amendment violation because the psychiatric examination at issue was requested by the defense, circumstances far afield from those presented here.

The Government's citation to United States v. Torres, 926 F.2d 321 (3d Cir. 1991) is irrelevant because Torres, involved admission of evidence seized in violation of the **Fourth** Amendment, an issue not implicated here.

The Government also relies on United States v. Krueger, 415 F.3d 766 (7th Cir 2005).   In Krueger, the Seventh Circuit held that it did not need to reach the question of whether the

22

defendant's statement was taken in violation of Sixth Amendment rights because there was adequate evidence outside of the defendant's statement to support the trial court's factual findings at sentencing. Krueger, 415 F.3d at 778. In *dicta*, the Seventh Circuit also stated that the statement would have been admissible at sentencing, even if taken in violation of the Sixth Amendment. Notably, in reaching that result, the Seventh Circuit did not even discuss the relevant Supreme Court precedent on admission of statements taken in violation of the Sixth Amendment at sentencing, Estelle v. Smith, 451 U.S. 454 (1981). Accordingly, Krueger should not be viewed as persuasive authority by this Court.

Thus, a defendant's unwarned, and uncounseled post-indictment statements may not be admitted against him, as the Government seeks to do here, at sentencing on the same charge for which the right to counsel has attached. The Government concedes that it seeks to introduce the statements as to the pending charges, conceding that "the statement is offered to show [Mr. Begolly's] lack of remorse and reformation." Response, at 14.

Indeed, the Supreme Court has unequivocally held that the introduction of statements obtained from a defendant, by a government informant, after the right to counsel has attached

23

violates the Sixth Amendment.  <u>United States v. Henry</u>, 447 U.S. 264 (1980)(With respect to the use of an inmate informant, the Supreme Court held that "by intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel.  This is not a case, where in Justice Cardozo's words, 'the constable blundered' [citation omitted]; rather, it is one where the 'constable' planned an impermissible interference with the right to the assistance of counsel").  <u>See</u> <u>also</u> <u>Massiah v. United States</u>, 474 U.S. 159 (1985)(Use of statements elicited from a defendant by an informant, post-indictment violated the Sixth Amendment).

Here, the Government asserts that it may introduce the statements at the sentencing for the charges upon which Mr. Begolly's right to counsel had attached, because "the purpose of the recording was to gather evidence on a matter for which Emerson Begolly was uncharged, and thus was unrepresented by counsel, namely Retaliation against a Witness (18 U.S.C. Section 1513)."  <u>Response</u>, at 11.  The Supreme Court rejected precisely that argument in <u>Maine v. Moulton</u>, 474 U.S. 159 (1985).

In <u>Moulton</u>, Moulton's codefendant, Colson, agreed to secretly cooperate against him.  In particular, Colson agreed to record telephone calls from Moulton concerning Moulton's

plans to kill a prosecution witness. <u>Moulton</u>, 474 U.S. at 480. Ultimately, Colson also agreed to record Moulton using a body wire, as was done in the instant case. <u>Id</u>., at 164-65.

When Moulton later moved to suppress the statements at trial, arguing their introduction violated the Sixth Amendment, the trial court denied the motion on the same basis the Government advances here - that the recordings "were made in order to gather information concerning the anonymous threats that Mr. Colson had been receiving, to protect Mr. Colson and to gather information concerning defendant Moulton's plans to kill [witness] Gary Newell." <u>Id</u>., at 166-67. The Supreme Court **_reversed_** holding that the government's legitimate interest in investigating new crimes, did not permit it to seek introduction of evidence obtained in such investigation in the criminal prosecution of charges for which the Sixth Amendment right to counsel had attached. <u>Moulton</u>, 474 U.S. at 178. Rather, "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, not withstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to counsel." <u>Id</u>., 180. The Supreme Court further reaffirmed its holdings in <u>Henry</u> and <u>Massiah</u>, that concealing the fact that an

25

informant is an agent of the police, denies the defendant the opportunity to consult with counsel and thus denies him the assistance of counsel guaranteed by the Sixth Amendment. <u>Id</u>., at 177. The <u>Moulton</u> Court further noted that, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment has not attached are, of course, admissible at a trial *of those offenses."* <u>Id</u>., at 180, n. 16. (Emphasis supplied).

The Supreme Court noted that by holding that the *purpose* of the uncounseled questioning was irrelevant to its admissibility, once the Government sought to introduce the statements in the criminal prosecution of the pending charge, the Supreme Court noted that it was simply reaffirming the holdings of <u>Massiah</u> and <u>Henry</u>. <u>Id</u>., at 178.

The First Circuit, in <u>United States v. Bender</u>, 221 F.3d 265 (1st Cir. 2000), a case cited by the Government, cited <u>Moulton</u> to reach the same result. The First Circuit rejected the Government's argument that the defendant's statements were admissible because the Government was investigating allegations that the defendant had stated he planned to falsify an alibi and kidnap and murder government witnesses. <u>Id</u>., at 269-70. The First Circuit further rejected the government's claim that <u>Moulton</u> was limited to direct statements by the defendant about the crime with which he has been charged, noting that "nothing

26

in *Moulton* supports that limitation and Sixth Amendment jurisprudence is to the contrary. *See Massiah*, 377 U.S. at 207, 84 S. Ct. 1199." Id., at 269.

Accordingly, introduction of Mr. Begolly's statements to the wired government informant at the sentencing of this matter would violate the Sixth Amendment and those statements must be excluded.

Similarly, the Supreme Court has repeatedly rejected the Government's argument that it may introduce the statements because it allegedly instructed its informant not to inquire of Mr. Begolly about "communications between Mr. Begolly and his attorney or details of criminal offenses with respect to which Begolly was represented." Response, at 9. Henry, 447 U.S. at 271-72. (Holding that agent's instructions to the informant not to question the defendant about the case in which he was charged were irrelevant to a determination as to whether the Sixth Amendment was violated. Court found that admission of statements obtained by the informant violated the Sixth Amendment); Moulton, 474 U.S. at 488 n. 14 (Rejecting the argument that the Sixth Amendment was not violated because the police instructed the informant not to interrogate the defendant. Sixth Amendment violated because "by concealing the fact that [the informant] was an agent of the state, the police

27

denied [the defendant] the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment").

WHEREFORE, for the reasons set out above, Emerson Begolly respectfully urges the Court to exclude his alleged statements to the wired government informant from his sentencing in this matter.

Respectfully submitted,

s/ Markéta Sims
Markéta Sims
Assistant Federal Public Defender
Attorney Pa. I.D. No. 66325